# Franklin Printing and Publishing Co. v. Matilda Behrens.

1.  PERSONAL INJURIES—*In Elevators—Prima Facie Case.*—In an action for personal injuries received in an elevator, evidence that the injury was caused by the careless and negligent operation of the elevator, the plaintiff being lawfully in it, is sufficient to sustain a recovery.

2.  PLEADING—*Special Damages, Special Averments Not Necessary.*— Damages resulting from an accident to a passenger in an elevator, such as injuries to an arm or leg, are not special; they are the direct and natural result of the injuries and such as the law implies, and therefore need not be specially averred.

3.  DAMAGES—*Under the Allegation Alia Enormia.*—In trespass, under the allegation *alia enormia,* damages which naturally arise from the act complained of, or which can not be decently stated, may be given in evidence in aggravation of damages, though not specified in the declaration.

4.  PLEADINGS AND PROOFS.—The court is of the opinion that, under the allegations of the declaration in this case, it was competent to prove any physical injuries, mental impairment or suffering, which were the direct result of the negligence charged.

**Action for Personal Injuries.**—Trial in the Circuit Court of Cook County; the Hon. CHARLES E. FULLER, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the October term, 1898. Affirmed. Opinion filed March 16, 1899.

JOHN A. POST and JOHN B. BRADY, attorneys for appellant.

JOHN C. RICHBERG, attorney for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellee was plaintiff, and appellant defendant, in the trial court. The declaration contains two counts, in the first of which the averments are, in substance, as follows:

Defendant was the owner of the building numbered 341–351 Dearborn street, in the city of Chicago, and rented the several floors thereof to sundry persons for their business purposes. Defendant maintained in the building an elevator and operated the same by its servants between the several floors of the building, for the conveyance of such

persons from any one of said floors to another. Plaintiff, February 25, 1895, while in the exercise of due care and caution for her safety, presented herself at the entrance to the elevator on the sixth floor to be carried thereon to the main floor, and was received into the elevator.

"Nevertheless the said defendant company, regardless of its duty in the premises, negligently, carelessly and improperly entrusted the management of said elevator to a careless and incompetent servant, and the said defendant company by its servants so carelessly, negligently and improperly controlled and operated said elevator, that by and through such carelessness, negligence and improper conduct, said elevator, just as it reached the said main floor and the door was opened for the plaintiff to step from said elevator on said main floor and was in the act of making her exit, was started upward, and before the plaintiff could safely make her exit; that by means of the sudden starting of the said elevator upward the said plaintiff was caught and crushed in the opening of said elevator, and crushed against the top crosspiece of the said elevator being at said main floor; and by means whereof the said plaintiff was then and there greatly bruised, wounded and lacerated, and sustained permanent and lasting injuries to her neck, jaw and spine, and her nervous system was greatly shocked, and her upper teeth knocked out, and the plaintiff was otherwise greatly bruised, wounded and injured, and also by means of the premises, the plaintiff became sick, sore, lame and disordered, and so remained and continued for a long space of time, to wit, from thence hitherto," etc.

The second count, after averring appellant's ownership of the building and the maintenance and operation of the elevator, and the receiving of the plaintiff therein at the sixth floor, substantially as in the first count, contains the following:

"And immediately thereupon, when said defendant company undertook to transport or lower the said plaintiff from said upper floor of their said building, the said elevator or hoist by reason of the broken, insecure and insufficient machinery by which the same was run, and by reason of the careless and negligent conduct of the defendant company in the care of the machinery, and in the running and operating of the same, and in the running and operating of the said elevator or hoist, without any fault

or negligence on plaintiff's part whatsoever, the said elevator or hoist upon reaching the said street floor, and while the door of said street door shutting in said elevator was opened for plaintiff's egress and she was in the act of making her exit with all due care and caution, said elevator or hoist, without any warning to the plainti T, suddenly started and shot upward, by means whereof the plaintiff was caught in the opening of said elevator or hoist, and with great violence crushed and struck against the upper casing of the doorway upon said street floor, and was knocked down and her face and head jammed between the floor of said elevator and the said casing, or cross-piece, and the plaintiff was thereby greatly bruised," etc.  It is further averred in this count: "That the plaintiff at the time aforesaid, had no notice or knowledge that the machinery whereby the elevator or hoist was run or operated was out of order, or broken, or insecure, or that the elevator was operated or run by an insufficient, incompetent, careless and negligent servant, and the defendant company had full notice and knowledge thereof," etc.

Appellant pleaded the general issue, the jury found appellant guilty and assessed appellee's damages at the sum of $15,000; appellant's motion for a new trial and in arrest of judgment was overruled, and judgment was entered on the verdict.

Appellant's counsel, in their argument, object that there was a fatal variance between the allegations and the evidence, and that the plaintiff's evidence failed to show that the machinery by which the elevator was operated was insufficient or unsafe, or that the servant of appellant, who was operating the elevator at the time of the accident, was incompetent; that the preponderance of the evidence is that the machinery was sufficient and the operator competent; that certain evidence of injuries to the appellee was improperly admitted, because not alleged in the declaration; that the damages are excessive, and that the court erred in not taking the case from the jury at the close of plaintiff's evidence, and, again, at the close of all the evidence.

At the conclusion of appellee's case in chief, counsel for appellant moved the court to exclude from the consideration of the jury the first count of the declaration, because

of an alleged variance between the count and the evidence, alleging as reasons therefor, that the only place in which it was alleged that the plaintiff was in the exercise of due care, was at the time she presented herself at the entrance to the elevator on the sixth floor; that there was no proof that the elevator was entrusted to a careless and incompetent servant; or that it was carelessly operated; or that it was started upward as appellee was in the act of making her exit; or that she was crushed against the top cross-piece of the elevator.    The first of the reasons assigned for the motion goes to the. sufficiency of the declaration, the remainder to the sufficiency of the proof.    The question of variance between allegations and proof is not raised by any reason assigned for the motion, nor does any such variance appear in the record.    Counsel base their objection on section 50 of the practice act, namely: "If one or more of the counts of a declaration be faulty, the defendant may apply to the court to instruct the jury to disregard such faulty count or counts," and say their understanding of the section is, that if there is no evidence to sustain a count, the court, on motion, may instruct the jury not to consider it. This is a misunderstanding of the section.    A faulty count, within the meaning of the section, is one which does not contain allegations which, even if proved, would sustain a verdict or judgment.    We do not think the declaration was materially defective in omitting to aver that the appellee was exercising ordinary care at the exact instant of receiving the injuries complained of.    The motion was expressly made on the ground of variance; the reasons assigned show no variance, and the motion was properly overruled.

Counsel also moved to exclude the second count from the consideration of the jury, on the ground that none of the plaintiff's evidence tended to sustain it.    Counsel predicated the motion on the proposition that the entire gist of the count was that the machinery of the elevator was defective, insecure and insufficient.    We agree with the trial court in-dissenting from this proposition.    The cause of the accident is averred in the second count thus :

"The said elevator, or hoist, by reason of the broken, insecure and insufficient machinery by which the same was run, and by reason of the careless and negligent conduct of the defendant company in the care of the machinery, and in the running and operating of the same, and in the running and operating of the said elevator or hoist, without any fault or negligence on plaintiff's part whatsoever, the said elevator or hoist, upon reaching the said street floor," etc., "suddenly started and shot upward," etc.

The court contains at least two distinct and independent charges of negligence, either of which is of itself a cause of action; one, the use of broken, insecure and insufficient machinery; the other, negligence in the running and operating the elevator; and while the count may have been obnoxious to special demurrer for duplicity (1 Chitty's Pl., 9th Am. Ed., 226–228), it by no means follows that it was incumbent on appellee to prove both causes of action to maintain her suit, appellant having pleaded the general issue. Evidence that the injury was caused by the careless and negligent operation of the elevator, the appellee being lawfully in it, is sufficient to sustain a recovery by appellee.

Appellant's counsel object to certain evidence of appellee as to injuries to her arm and leg, and the effect of her injuries on her hearing and her mental condition, on the ground that such injuries are not specially averred in the declaration. Counsel say these are special injuries (whatever that may mean), and that the damages resulting therefrom are special damages. Damages resulting from such injuries are not special; they are the direct and natural result of the injuries and such as the law implies, and therefore need not be specially averred. 1 Chitty's Pl. 395. In trespass, under the allegation *alia enormia*, damages and matters which naturally arise from the act complained of, or which can not decently be stated, may be given in evidence in aggravation of damages, though not specified in the declaration. Ib. 397. See also Roberts v. Graham, 6 Wall. (U. S.) 578. For further illustration of the distinction between general and special damages, see Olmstead v. Burke, 25 Ill. 86, Miles v. Weston, 60 Ib. 361, and Adams

v. Gardner, 78 Ib. 568. We are of opinion that, under the allegations of the declaration, it was competent to prove any physical injuries or mental impairment or suffering, which were the direct results of the negligence charged.

At the close of appellee's case, appellant also moved the court to exclude from the jury all of appellee's evidence, and presented to the court a written instruction to find the defendant not guilty. The motion was overruled and the instruction refused, but appellant waived exception to the ruling in that regard by introducing evidence on the merits. Gilbert v. Watts-DeGolyer Co., 169 Ill. 129.

Appellee was about twenty years of age at the time of the accident, and was employed as a stenographer by the Franklin Engraving and Electrotyping Company, whose place of business was on the sixth floor of appellant's building. Between twelve and one o'clock in the forenoon of February 25, 1895, she took the elevator at the entrance thereto on the sixth floor, to descend to the first or main floor, for the purpose of going out to lunch. Louis Grego, a boy then about sixteen years of age, was operating the elevator. Appellee testified:

"I got into the elevator at the sixth floor and rode down to the first floor, and the elevator stopped and the boy opened the door, and I was just in the act of getting out, when up shot the elevator, and the next instant I felt the bones crushing, and all of a sudden I was free again, and then I seen the elevator boy pull the lever backward and forward, and then we went down to the first floor again. We had gone nearly to the second—I could see the doorway—we had got through to the second floor—and then I was taken out of the elevator," etc. * * * "Nothing occurred between the operator of the elevator and myself from the time that we started from the sixth floor until we got to the main floor. When we got to the main floor the elevator man stopped the elevator and opened the door for me to get out. I was just in the act of getting out—I was just going to step out of the door of the cage—I was looking out of the cage, ready to step down on the floor. There was no one else in the elevator besides myself and the boy. The elevator flew up."

On cross-examination appellee testified:

"The elevator came to a full stop, and then he opened the door for me to step out. I was looking out of the door; did not see him do anything; just stepped out next; was in the act. The next I noticed or knew, the elevator flew up; it flew up like lightning."

Stagemann, a witness for appellee, testified:

"I had some work done for the electrotyping company, and was waiting for the elevator to come down. The door was open and her foot protruded, and after a minute the foot disappeared again and there was an awful outcry, and I ran up to the door and the door was open. I looked up and there was the elevator, just about half way between the floors. Then it came down and I got her in my arms,". etc.

Appellee, as was natural, could not testify as to what her body came in contact with, or against what she was crushed when the elevator shot up. This is a circumstance greatly relied on by appellant's counsel. The short distance between the first and second floors—about twelve feet—and the short space of time required for the elevator to ascend nearly to the second floor, and the suddenness of the start upward, were such that had appellee undertaken to state against what she came in contact with, it might well have been relied on as affecting the credibility of her testimony.

The only witness produced by appellant, who testified as to the cause of the accident and the manner in which appellee was injured, was Grego, the elevator boy. The evidence shows that Grego's regular employment was that of office boy, and that he operated the elevator only from twelve o'clock noon, or 12:30 o'clock, till one o'clock P. M., for the purpose of temporarily relieving the regular operator, whose name was Johnson, and that he had been operating it only about a month and a half before appellee was injured.

Grego testified as follows:

"I took her on at the sixth floor. She was the only passenger on the elevator. When I got to about between the third and second floors Mr. Sherwin and two other gentlemen hollered 'Down!' So I never took them down; I went past them, and when we got between the first and second floors there was an iron shaft door that closes evenings and opens in the morning—when he closes down the eleva-

tor and starts it up in the morning. So, finally, between the second and third floors she looked up; and before, when I ran her down from the sixth to the first and from the first up to the sixth, during the noon hours, she always had a habit of getting on the east side of the platform and coming on the west close to the door of the cage, and so I have told her many times to keep away from there, and finally one day—that day—she stuck her toes about two inches or two inches and a half over the edge of the platform, and perhaps—I don't know—the door slides very easily; and at the same time she caught the door, and when she caught it I heard it snap—it has a kind of a snap lock—which may be caught her foot in there. I don't know how it was, but she fell back. She fell back the first time; I thought perhaps she was fooling, so I pulled her up and she fell back on my right arm; I have the lever in my left hand going down and always work it with my left, and, going up, with the right; so the first time I held her up. The first time she fell on the lever hand, and I had the lever in this position—the handle stuck out about an inch and a half—so she fell back and that pressed the lever back, and kind of pushed the lever back so that the elevator goes up about five or ten feet, perhaps eleven; I can not tell exactly how far it went up; so I brought her down to the first floor, and that's just how it was; I don't know anything more of it."

The following, which occurred in the examination of the witness, indicates that he was merely theorizing as to the cause of the accident:

Q. "Describe that (door) how it projected in there and how it caught her foot. A. The time she got caught this door slid—slides very easily—and the time it slid, it moved —catched her like there you know, and she fell back on me, and that's how it caught. *I couldn't tell you any other way, because I don't know—that is the only way I think it was done.* She fell back on me and then I told her to stand up and quit her fooling, and then she fell back on me the second time and falls onto the handle of the lever."

The evidence of this witness also indicates that he was descending from the sixth floor rapidly, because he states that he declined to stop at the second floor to take down passengers who were hallooing to him to stop. He, therefore, had but little opportunity to observe the appellee. The door which he refers to in the foregoing testimony is

not a door in the elevator, but outside of it, in the shaft, on the first or main floor, and which can be opened by one inside of the elevator. It is thus described by one of appellant's witnesses:

"The door is of corrugated sheet iron. It is probably one-twentieth or one thirty-second of an inch thick. The upper part of it lays close to the elevater on the west side. When it is raised it is some distance above the opening. When you walk into the elevator cage or walk out, it is above you. In pulling it down you have to catch it from the bottom with your hands. The lower part of it rests in two slides down below the car, below the main floor, running into the basement. The lower part of the corrugated door is not observable when you step into the elevator cage from the street entrance, only the top of it. The top of it is exactly flush with the floor."

Another of appellant's witnesses testified that the door consisted of two parts, that one of the parts slid up and the other down; that they run on cranks with a balance attachment; that they can be brought together very easily, and that on the top of the door is an iron flange about one and one-half inches in width, extending clear across the top, and that the distance from the elevator, well out to the door, is two or two and one-half inches. The evidence also shows that when the top part is pulled down, the lower part, at the same time, moves up, and that the two parts meet and become fastened. Grego testified that there is a space of four or five inches between the shaft and the elevator. Now, if there is a space of four or five inches between the shaft and the elevator, and if the main door is two or two and one-half inches from the elevator, and the flange on top of the door only one and one-half inches wide, leaving about three-quarters of an inch extension on each side of the door, and appellee's foot extended from the edge of the elevator platform one and one-half inches, as Grego said at one time, or two or two and one-half inches, as he said at another time, it is difficult to understand how appellee's foot pressed against the upper flange of the door. In his examination in chief, Grego testified: "The door slides very easily,

and, at the same time, she caught the door, and when she caught it I heard a snap; it has a kind of snap lock which, *may be*, caught her foot in there," evidently intending to be understood that the sliding door came together. In his cross-examination he says:

"The iron slides easily up and down. Any pressure on top of the iron door would make it come down, unless it would get caught some different way. The sliding door went down about two or three feet." Q. "Two or three feet?" A. "Yes, sir. Went down, and she must catch, you know, and when it did catch I suppose she jumped. I don't know how it was myself. I could not explain the rest." * * * Q. "Didn't you say it come down two or three inches?" A. "No, sir." Q. "Or a short distance?" A. "I said about two or three feet at first, and then I said it snapped." Q. "You say it snapped, do you?" A. "Yes, sir." Q. "When?" A. "At the time the door closed."

If the two parts of the iron door of the shaft came together with a snap, they would have locked automatically, as the evidence shows, but Stagemann testified that when he looked up the door was open.

For the purpose of contradicting or impeaching the testimony of Stagemann, appellant's counsel put in evidence the following written statement signed by him February 27, 1895:

"Following statement of accident, as far as witnessed by myself, sustained by Miss Behrens, in the elevator running in the Conkey building: Entering the door at about 12:45 P. M., on Monday, February 25, 1895, I heard screaming in the elevator, then in its course down, and after the elevator boy opened the door I saw said Miss Behrens in a standing position in the corner of the elevator platform, screaming in a terrible way, with blood streaming from her mouth, half of her ear torn from her head, and her front teeth knocked in."

The door referred to in this statement by the words "the elevator boy opened the door," was the elevator door, which Grego, and Law, another of appellant's witnesses, testified was made of wood and glass, and not the shaft iron door which was kept open during the day time when the elevator was in operation, and which, had it been closed, Stagemann

could not have looked up. On this statement being presented to Stagemann, he testified, in substance, that it was true as far as it went, but not sufficiently full.

Grego testified on cross-examination, that before the accident occurred, he said to appellee, "Watch out, you are liable to get hurt." Appellee testified positively that no such thing occurred; also that neither of her shoes was injured, as in all probability would have been the case had it come in contact with the door with force enough to cause her to fall. Grego's theory of how the accident occurred is, as we think, wholly inconsistent with the injuries which appellee received. His theory is that she was injured by falling on the handle of the lever, by means of which the elevator was operated. Law, appellant's witness, testified that the elevator cage is about four by four and one-half feet. The lever moves in a quadrant or arc. Grego testified that the lever is situated on the south side of the elevator, and Andrew Neill, appellant's engineer, and witness, that it is situated on the north side. There is a notch in the center of the quadrant, into which the lever is moved when it is desired to stop the elevator. Underneath the lever there is a spring which must be pressed in order to get the lever out of the notch, so as to move it in either direction in the arc. The lever is about three and one-half or four feet high from the floor, and extends above the arc about one and one-half inch. Appellee was standing on the west side of the elevator in its descent. Appellee was taken to the Presbyterian hospital immediately after the accident. Dr. Morris, who attended her, testified that her lower jaw was broken, her upper lip cut, her right arm bruised below the shoulder, her knee injured, her left ear almost completely torn from her head, and a cut on the top of her head. In regard to her treatment, he says:

"I sewed on the ear, and, I believe, drilled one-half of her jaw when Prof. Senn came. Prof. Senn finished the operation of wiring the jaw; stimulated her and put her to bed. She had a cut at that time on the top of her head, but I did not discover it until the next day. I presume it did not cause any pain, and her attention was not drawn

to it. She remained in the hospital until the 1st of April. I turned her over to Dr. Miller. We put a plaster paris cast on her jaw to support it after we wired it; we put on surgical dressing to her ear, putting the knee in straight position. Dressed this abcess on the jaw after I came back, trying to get the dead bone out of the jaw. I had charge of her until the 1st of June; that is the last I saw of her professionally until about a month ago. * * * When this jaw was broken, there were probably five, six or seven teeth missing. I inserted this gag so as to break the adhesions at the hinge of the jaw every couple or three days. The ear healed at once, and the jaw, so far as the bone was concerned, made a very good union—splendid, at least to my idea—and at the time I left (the 1st of April), outside of the adhesions of the jaw and this abscess under the jaw, she seemed to have recovered from the immediate effects of the accident; she seemed to recover from the shock very well. When I examined her about a month ago, my attention was called to her jaw from the unsymmetrical appearance. One side of the jaw seemed to protrude more than the other—the angle of the jaw."

Dr. Bergeron testified that he treated her five or six months after the injury; that she was suffering from general anaemia and insomnia; was exceedingly nervous, and had a poor appetite; that he examined her upper and lower jaws; that her teeth did not meet by about one-eighth inch, and she masticated on one side only, the effect of which would be a development of that side and a shrinking of the other.

Appellee states her injuries and the treatment of them as follows :

"The left limb was hurt at the knee. It was all black marked around it, and the limb there. I have no strength in it as I have in the right limb. I have no strength in the right arm whatever. Can not do anything which requires any strength. Have not been able to do anything in my avocation since the injury. My jaws were drilled through and wire put in it in the center. I could feel the wire all the time—it was right in there twisted around; and then my ear was sewed on. And then I had a cut in my head right here (indicating), and my hair covered it so that it didn't show. At the time of the injury I wore a felt turban—a small felt hat. After the accident

my hat was cut right where the cut was in my head.    I had a black dress, a heavy coat with a cape, and the coat was all torn where this arm was hurt, the stitches were all torn, and the material was all torn.    It was a heavy beaver. Pieces of my dress were torn right out where the knee was hurt — the left one.    They put my head in plaster — a plaster cast—which they took off whenever they dressed the wounds, and it was so tight I could not open my mouth, and I had to lay perfectly quiet; I could not speak —I could not take any food, except what I could get through a small glass tube, for six weeks; and I had to lay straight on my back, for if I had moved the jaw would have come out of place.    At the second week an abscess formed under my chin here, from the bone or splinters that had come out of here—formed an abscess, and that had to be lanced and they could not give me anything for that.    They did not chloroform me, or anything.    I had to have my senses through all.    It came right through my mouth—the medicine they put through it; the hole went through to the mouth from this abscess.    And at the end of the fifth week they took out this wire that he had fastened in there, and they had to pull it out with an instrument, and twist it and pull it out, and then at the sixth week they took this cast off; it had been on all this time; they took it off for good.    Then they discovered that my mouth was so tightly closed that I could not get it open, and so they said it would have to be broken open; and so they inserted an instrument where my teeth are out in front here, and then they pushed it around and got it so that they could put that instrument in so that they could work it, and then they broke this open; it was just like breaking my whole head to pieces.    The joints had to come loose.    The first time they did it, it was like two hours, and I suffered terribly, and then when they had taken it out, the mouth closed just as tight as ever.    After that it had to be put in every day; the jaws did not get better that one time, that's what I mean.    I had to exercise it; open it all day long, try to open it, and open so slowly that I could hardly notice it.    The doctor came in the morning for two weeks with that same instrument, and did the same thing over again.    Dr. Miller did it after Dr. Senn did it the first time.    At the end of every day it seemed I got it open a little wider, and still it didn't act natural like it should.    So I left the hospital at the end of nine weeks, and then the doctor didn't put it in any more— the instrument.    The week before I left the hospital they

lanced this again.   There was some more dead bone in here, and I did not have any ether or anything.   They lanced that and took out a little bone, and there was still some left.   I left the hospital at the end of nine weeks.   Went three times a week to have this abscess dressed, as it was always discharging.   I used to see Dr. Senn quite often.   I kept on coming and having them put a probe in there, for the opening was still open.  They put medicine in here, peroxide, through a glass syringe, which was very painful, and then they would seal it up with a little dressing.   Kept on coming until October, and then Dr. Senn was back again.   The 2d of October I was operated on again.   They took out all the dead bone.   When I ' came to ' from the ether, this was all sewed up and was all bandaged up.   I had to lay quietly and in a few days they took out the stitches and dressed it, and then my jaws were stiff again.   But I exercised them myself, so that I didn't have to have the instrument put in again.   I went home; and then I came every other day to have it dressed, and on the 30th of October, 1895, it was all healed.   Afterward I went to Dr. Bergeron.   Ever since then my mouth has been like I have not been able to chew on the left side at all, for part of my jaw is gone—all the bone—and the teeth do not meet, so that I have to chew on the right side.   I had very nice teeth—they are all spoiled now, for of those that are left, half are dead.   The other half are useless, and I have not been able to feel like I did before."

Grego's theory is that the cut through the hat and on top of the head, the broken jaw, the knocked-out teeth, and torn-off ear, the bruised arm and knee, the torn coat and dress, all resulted from the appellee falling on the lever which extended from the arc only about one and one-half inch, and which, as he says, he had in his left hand.   It is not surprising that the court and jury were somewhat impatient while listening to the announcement of this theory and that this occurred in Grego's examination:   Q.   " Do you know how this lady hit the top of her head, so it cut a hole through her hat?"   A.   "I could not tell you."   Q. " Did she do that by falling on the lever?"   A.   " That is the only way she could do it."   The jury was fully warranted in discrediting Grego's theory and in finding that the accident occurred by reason of his carelessness and negli-

gence in operating the elevator, and that appellee was injured in the manner stated in the second count of the declaration. The fact that the elevator shot upward after it had reached the main floor, and while appellee was attempting to alight from it, is of itself evidence of want of care and mismanagement in its operation.    Hartford Deposit Co. v. Sollitt, 172 Ill. 222.

The appellant introduced evidence to show that the machinery of the elevator was in good condition, and that Grego was competent to operate the elevator; but, in the view we take of the case, we do not consider it necessary to refer to this evidence.

The court, at the close of all the evidence, properly overruled appellant's motion to instruct the jury to find the appellant not guilty.

Appellant's counsel urge that the court erred in giving appellee's second and third instructions, and in refusing to give the following instructions at appellant's request:

"The court instructs the jury that if they believe from the evidence that this car descended in the usual way and that this accident was not occasioned by the manner in which this elevator was conducted and operated, they should find the defendant not guilty."

"The court instructs the jury, as a matter of law, that if, after a careful consideration of all the evidence in this case, they are unable from the evidence to determine whether the plaintiff was injured in the way and by the means detailed by her in her examination, or whether she received her injuries in the way detailed by the witness Grego, then the jury must find the defendant not guilty."

We find no error in either of the second or third instructions for appellee.    The first of the above instructions is wholly inapplicable to the facts of the case, and was properly refused.    As to the second, the appellee did not undertake to "detail" the precise manner in which she was injured; she merely testified that she was injured by the elevator flying up, but what she came in contact with or was crushed against, she said she did not know.    We think the instruction was properly refused.

The court gave twenty-six instructions for appellant, fully instructing the jury on every possible phase of the case.

Lastly, it is urged that the damages are excessive. It does not appear from the record that any improper influence was exerted upon the jury by the remarks of counsel or otherwise, or that the trial was in any respect unfair.

The appellant introduced no evidence contradictory of appellee's evidence of her injuries, and in view of the evidence in regard to her injuries, we can not say, from the mere amount of the verdict, that the jury was swayed by passion, prejudice, or undue partiality for appellee. Under these circumstances, we are not aware of any sound principle which would warrant us in holding that the damages are excessive.

The judgment will be affirmed.